UNITED STATES of America,
Plaintiff–Appellee,

v.

Antonio ROBLES–ALVAREZ,
Defendant–Appellant.

No. 95–50177.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 13, 1995.

Decided Feb. 5, 1996.

Carlton F. Gunn, Senior Deputy Federal Public Defender, Los Angeles, California, for defendant-appellant.

Richard E. Drooyan, Assistant United States Attorney and Lisa E. Feldman, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee.

Before: HALL and NOONAN, Circuit Judges, and SHUBB,* District Judge.

SHUBB, District Judge:

Antonio Robles–Alvarez ("Robles") appeals the district court's denial of his motion to suppress statements made by him after a traffic stop of a car in which he was a passenger. Following a written plea agreement in which Robles expressly reserved his right to appeal the denial of the motion to suppress, Robles entered a conditional plea of guilty to one count of illegal reentry after deportation in violation of 8 U.S.C. § 1326(b)(1). On April 3, 1995, Robles was sentenced to fifteen months in custody and a two-year term of supervised release. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## I.

For more than two years prior to November of 1994, Officer Dennis O'Sullivan had been assigned to the "CRASH" (Community Resources Against Street Hoodlums) Unit of the Los Angeles Police Department ("LAPD"), which gathers information on gang members and gang organizations in the Rampart area of Los Angeles. In early November of 1994, he received information from a confidential informant, who had given him truthful information in the past, and was known by him to be a member of the "18th Street Gang," that another member of the gang, nicknamed "Skipper," "had a gun with him all the time because he was collecting rent in the neighborhood from the drug dealers."[1] The informant also told Officer O'Sullivan that "Skipper" "illegally possessed a gun in his car." Officer O'Sullivan knew "Skipper" and could identify him.

Shortly thereafter, on November 8, 1994, Officer O'Sullivan and his partner, Officer Thornton, were patrolling in their police vehicle in an area in which the "18th Street Gang" was active when, at about 4:00 p.m., they observed "Skipper" driving an automobile on a city street. Officer O'Sullivan observed that neither "Skipper" nor the pas-

senger (later identified as Robles) were wearing seat belts. Based on the information received from the informant and based on the fact that neither occupant of the car was wearing a seat belt, in violation of California Vehicle Code § 27315(d) and (e), the officers stopped the car.

Officer O'Sullivan then asked both men for identification. Although "Skipper" was able to produce a California identification card, Robles indicated that he did not have any identification. When Officer O'Sullivan asked Robles his name, Robles gave a name but was unable to spell it. Officer O'Sullivan concluded that Robles was providing false information in violation of California Penal Code § 148.9. Officer O'Sullivan also asked appellant if he had ever been arrested. Robles admitted that he had, that he was presently on felony probation, and that he was an "18th Street Gang" member.

Robles was placed under arrest and transported to the local police station. After learning Robles' true name, Officer O'Sullivan obtained Robles' rap sheet and found that he had no outstanding warrants. Listed on the rap sheet, however, was a violation for "deportation proceedings." Immigration and Naturalization Service ("INS") Special Agent James Jones subsequently questioned Robles regarding the disposition of the deportation proceedings. Robles admitted that he had been previously deported to Mexico, that he was a citizen of Mexico, and that he illegally re-entered the United States. Robles also admitted that he had been convicted of a firearm violation.

Thereafter, Agent Jones transported Robles to an INS detention facility where he was taken into custody for administrative processing for deportation. The next morning, November 9, 1994, after voluntarily waiving his Miranda rights, Robles was interviewed by Agent Debra Gutierrez. In the interview, Robles again admitted having been previously deported, having been previously convicted of illegal possession of a firearm, and having re-entered in the United States

---

* Honorable William B. Shubb, United States District Judge for the Eastern District of California, sitting by designation.

1. Officer O'Sullivan testified that "rent collection" is a term used by gang members for the extortionist tactic of taking money from people who live in or frequent their neighborhoods.

illegally. He was then placed under criminal arrest for violation of 8 U.S.C. § 1326.

## II.

On December 27, 1994, Robles filed a motion to suppress (1) any testimony by the officers who made the traffic stop identifying him as the person they detained and arrested, and (2) any statements to INS agents admitting he was in the United States illegally, upon the grounds that all such evidence constituted the fruits of an unlawful detention and arrest. After holding an evidentiary hearing, the district court denied the motion. The district court found that the initial traffic stop was not pretextual, that a reasonable officer would have performed the vehicle stop for violation of the seat belt law, and that CRASH officers are responsible for enforcing that law.

■ We review the legal conclusions of the district court *de novo;* the district court's findings of fact are reviewed for clear error. *United States v. Hernandez,* 55 F.3d 443, 446 (9th Cir.1995).

## III.

Robles argues that the district court erred in not finding the stop pretextual. He contends that a reasonable officer assigned to the CRASH Unit would not have stopped and cited him for failing to wear a seat belt in violation of California Vehicle Code section 27315. Essentially, Robles argues that the district court should have parsed its analysis by examining whether a reasonable CRASH officer, not just a reasonable police officer, would have stopped the vehicle. We disagree.

■ "A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." *United States v. Cannon,* 29 F.3d 472, 474 (9th Cir.1994) (quoting *United States v. Guzman,* 864 F.2d 1512, 1515 (10th Cir.1988)). The pretextual stop doctrine does not, however, prohibit the use of evidence serendipitously discovered as part of a legitimate traffic stop. *United States v. Millan,* 36 F.3d 886, 888 (9th Cir.1994).

■ To determine whether a particular stop is pretextual, this circuit has adopted an objective test. In *Cannon,* 29 F.3d at 475–476, this court surveyed Ninth Circuit case law and concluded that the appropriate inquiry is whether a reasonable officer would have made the stop anyway, apart from his suspicions about other more serious criminal activities. In making this inquiry, we do not examine the subjective motivations of individual officers or their particular job assignments, both of which are subject to change at any time. *See Hernandez,* 55 F.3d at 445 n. 2 (9th Cir.1995); *Millan,* 36 F.3d at 890–891 (Hall, J., concurring). Instead, we concentrate simply upon the conduct of the suspect and whether a reasonable officer with authority to do so would stop the vehicle when confronted with such conduct. *See e.g., Hernandez,* 55 F.3d at 446–47 (9th Cir.1995) ("no reasonable officer would stop" motorist whose car was legally parked under Montana law); *Cannon,* 29 F.3d at 476 ("any reasonable officer would stop" a motorist driving with a suspended license in violation of California law); *United States v. Lillard,* 929 F.2d 500, 502 (9th Cir.1991) (reasonable officer would stop a motorist speeding "carelessly in violation of Oregon law").

■ Thus, in order to determine the lawfulness of a traffic stop, the trial court need only find that (1) under the circumstances a reasonable officer would stop the suspect for violation of a specified law, and (2) it was within the detaining officer's scope of responsibility to enforce that law. The trial court need not answer the more specific question of whether a reasonable officer assigned to the particular duties of the detaining officer would stop the suspect. To hold otherwise would impose a particularized examination, akin to a subjective test, which this court explicitly rejected in *Cannon.*

■ The district court found that a reasonable officer would have stopped the vehicle based upon his observation of the occupants' violation of California's seat belt law, and that Officer O'Sullivan was responsible for enforcing that law. These findings are

legally sufficient, supported by the evidence,[2] and not clearly erroneous. Having found that the seat belt violation justified the stop and was not a pretext, the district court properly denied the motion to suppress.

Accordingly we AFFIRM.

**2.** Officer Joshua H. Adler, another "CRASH" detective, testified by declaration and provided live testimony that although the LAPD does not have a specific policy regarding enforcement of the seat belt law, the general policy regarding traffic enforcement was set forth in § 1.580.10 of the Manual of the Los Angeles Police Department, which states that the Department "... will take enforcement action upon the detection of an illegal and potentially hazardous act ..." and that "[e]nforcement action may consist of a warning, citation, application for complaint, or physical arrest."

In his declaration, Officer Adler stated that pursuant to § 1.580.10 officers of the LAPD may, and routinely do, perform vehicle stops based solely on violations of the seat belt law apart from any suspicions about other criminal activity, and that it is within the officer's discretion whether to warn, cite or arrest the violator. He stated that he has made many vehicle stops, and observed many other LAPD officers perform vehicle stops, based solely on a violation of the seat belt law. At the hearing, Officer Adler testified that in his opinion, absent some pending emergency, under normal circumstances a reasonable LAPD officer would make a stop when that officer observes a violation of the seat belt law.